UNITED STATES of America,
Plaintiff,

v.

Gary BAILEY, Defendant.

Gary Bailey, Third–Party Plaintiff,

v.

Lake of the Woods County, Third–
Party Defendant.

No. 05–CV–2245 (PJS/RLE).

United States District Court,
D. Minnesota.

Sept. 25, 2007.

See also 2003 WL 21877903.

Friedrich A.P. Siekert, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, Daniel R. Dertke, United States Department of Justice, Washington, DC, for Plaintiff.

Alan B. Fish and Rita Fish–Whitlock, Alan B. Fish, PA, Roseau, MN, for Defendant.

Scott T. Anderson and Sonya J. Guggemos, Ratwik Roszak & Maloney, PA, Minneapolis, MN, for Third-Party Defendant.

M. Reed Hopper, Pacific Legal Foundation, Sacramento, CA, Rita Fish–Whitlock, Alan B. Fish, PA, Roseau, MN, for amicus curiae Pacific Legal Foundation.

## MEMORANDUM OPINION AND ORDER

PATRICK J. SCHILTZ, District Judge.

Defendant Gary Bailey constructed a road on a parcel of wetland located in Lake of the Woods County, Minnesota, without obtaining a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. In October 2001, the United States Army Corps of Engineers ("the Corps") ordered Bailey to restore the land to its pre-violation condition. After Bailey refused to do so, the United States brought this action under Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to enforce the restoration order and to enjoin Bailey from discharging further pollutants into the wetland.

The United States, Bailey, and third-party defendant Lake of the Woods County ("the County") have all moved for summary judgment. For the reasons set forth below, the Court denies Bailey's motion, grants in part the motion of the United States, and grants the County's motion. The Court orders Bailey to restore the wetland that he unlawfully polluted almost a decade ago.

## I. BACKGROUND

Bailey owns a parcel of land located along the western shore of Lake of the Woods ("the Lake") in northern Minnesota. This 13-acre site ("the Site") consists mostly of wetland, as defined by the Corps.[1] Eggers Decl. Ex. X ¶ 4.G, Jan. 30, 2007 ("Eggers Decl."). Bailey planned to plat the Site for residential development and sell lakeside lots. To that end, Bailey hired Mark LaValla in 1998 to construct an access road through the Site. In May and June of 1998, LaValla cleared a roadway sixty-six feet wide and approximately a quarter of a mile long. LaValla Dep. 22, 57, Oct. 16, 2006 ("LaValla Dep."). The roadway runs from north to south, parallel to the Lake of the Woods shoreline. The north end of the roadway connects to a preexisting road known as Sandy Shores Drive. Bailey's planned development was known as Sunny Beach, and the access road Bailey constructed is informally called Sunny Beach Road ("the Road"), although it is labeled "Sandy Shores Drive" on the plat Bailey later filed with the County. The Road was built along the western edge of the parcel (the edge furthest from the Lake). As platted, the Site has fourteen lots running from the Road to the Lake, and each lot has approximately 100 feet of lakefront. Bailey has sold some lots and continues to own the others.

LaValla dug a ditch on each side of the roadway and used the excavated material to construct the Road itself. LaValla Dep. 33–36, 41–42, 47. LaValla also installed two culverts beneath the north and south ends of the Road.[2] LaValla Dep. 103–04,

1. Bailey admits that the Site includes some wetland, but he denies that the Site consists primarily of wetland or that the roadway itself was constructed in wetland. Def.'s Resp. to Pl.'s First Set of Req. for Admis. Nos. 11, 15, 18, 26. As discussed below, the problem for Bailey is that he has not supported his posi- tion with anything like competent evidence. The United States, by contrast, has offered expert evidence that the Site—including the land on which Bailey constructed the roadway—consists almost entirely of wetland.

2. The record is somewhat unclear regarding the placement of culverts on the Site. As best

127 & Exs. 2, 20, 24. Finally, LaValla topped the Road with approximately 2000 square yards of gravel (about 130 truck-loads) from his gravel pit. LaValla Dep. 82–84, 99.

Bailey was informed several times, by various government officials, that the Road was not legally authorized and that he should stop construction until he obtained a proper permit. On June 11, 1998, after LaValla had cleared the roadway but before work on the Road was complete, employees of the local Soil and Water Conservation District visited the Site and told LaValla that the Road was not properly permitted and that he should stop construction, which he did. LaValla Dep. 88–90 & Ex. 6. A few days later, a Corps official visited the Site with Bailey and several County employees. Administrative Record ("AR") at COE0438. The Corps official, Jeff Koschak, told Bailey to do no more work on the Road. *Id.* About a week later, a representative from the Environmental Protection Agency ("EPA") told Bailey that the EPA would not pursue enforcement action against him as long as no further work was done at the Site pending the issuance of a permit. *Id.* Even before June 1998, Bailey was aware that he would need a permit to construct a roadway on the Site, as Bailey had tried to develop the Site in 1993, and the Corps had informed him then that he would need a permit before placing any dredged or fill material on the Site. AR at COE0049 (August 18, 1993 letter advising Bailey that he needed a permit before placing dredged or fill material on his land for the purpose of developing residential lots).

On June 17, 1998, Bailey filed a Local–State–Federal Project Notification Form with the County proposing to construct an access road for logging in the Site. AR at COE0069–70. The Corps received a copy of this form on August 17, 1998 and treated it as an after-the-fact application for a permit under Section 404 of the CWA. Bailey Dep. Ex. 6, Nov. 17, 2006 ("Bailey Dep."). Without waiting for a decision on his application, Bailey instructed LaValla to complete the Road, which LaValla did later that summer. LaValla Dep. 105–06; Bailey Dep. 44–46. Bailey alleges that Doug Easthouse of the Soil and Water Conservation District told him that the Corps would approve the application and that he should go ahead and finish the Road. Bailey Dep. 46. The timing of these events is somewhat unclear, but the record indicates that the Road was complete by September 17, 1998—the date on which the Corps notified Bailey in writing that the Road violated the CWA, that his application for an after-the-fact permit was incomplete, that no additional work should be done on the Road before obtaining a permit, and that, if his permit application was ultimately denied, Bailey might be required to restore the land to its previous condition. Bailey Dep. Ex. 6.

Bailey intended that, once the Road was completed, he would dedicate it to the County, so that the Road would become public and the County would be responsible for maintaining it. For that reason, Bailey solicited the County's guidance on complying with County road specifications. (Obviously, the question whether a road meets County road specifications is entirely separate from the question whether a road meets federal environmental standards.) At Bailey's request, the County inspected the Road and, by letter dated

---

as the Court can tell, LaValla placed two culverts on the Site—on the north and south ends of the Road—and individual landowners to whom Bailey sold plots installed culverts under the spots where their driveways con-

nect to the Road. There is apparently also a preexisting culvert on the northern edge of the Site. Def.'s Mem. Resp. Pl.'s and Third Party's Mots. Summ. J. 11 n. 4; Hasbargen Dep. 23–26, Aug. 26, 2005.

September 16, 1998, informed Bailey of certain improvements that were necessary to bring the Road into compliance with County road standards. Bailey Dep. 52 & Ex. 5; LaValla Dep. Ex. 20. The County sent Bailey another letter, in November 1998, containing more specific recommendations and requiring Bailey to post a $10,000 bond to ensure that the Road met County standards. Bailey Dep. Ex. 4; AR at COE0633. In the spring of 1999, Bailey hired LaValla to make the improvements to the Road, which included adding about 530 square yards of gravel and replacing the culverts with new pipe. (The previous culverts were made of used pipe.) LaValla Dep. 120–21 & Ex. 20. LaValla purchased the gravel from a County gravel pit. LaValla Dep. 122–23 & Ex. 23.

At the same time that Bailey was working on the Road, he was preparing to gain approval for platting the Site. In October 1998, Bailey filed an application with the County to plat fourteen residential lots on the Site. Bailey Dep. 64; Lockner Dep. 16, Aug. 25–26, 2005. By the time Bailey applied for the plat, he had already received the Corps's notice of violation. Bailey Dep. 64. The County environmental-services director, Gary Lockner, recommended approval of the Sunny Beach plat, and the County's Board of Commissioners approved the plat on December 22, 1998. AR at COE0104; Bailey Aff. Ex. 2 ¶ 6, Aug. 3, 2006. The plat states that Bailey and his wife "do hereby donate and dedicate to the public for public use forever SANDY SHORES DRIVE, the road shown on this plat." Stromlund Aff. Ex. N, Feb. 1, 2007. At oral argument, the County conceded that the Road became a public road upon the Board's approval of the plat, although the County disputes the nature of its property rights over the Road.

On June 12, 2001, the Corps denied Bailey's Section 404 permit application.[3] Bailey Dep. Ex. 7. On October 22, 2001, after a period of public notice and comment, the Corps ordered Bailey to restore the property at his own expense. Specifically, the Corps ordered Bailey to: (1) remove the dredged and fill material used to construct the Road; (2) fill in the ditches; (3) seed the restored area with a specified seed mixture; and (4) control certain weed species for three years following restoration. *Id.* The Corps ordered Bailey to complete the restoration and seeding by October 15, 2002. *Id.*

After Bailey refused to comply with the restoration order, the United States brought this action to enforce it. Bailey counterclaimed, arguing that the Corps does not have jurisdiction over the Site and that the Corps's restoration order is arbitrary and capricious. Bailey also brought a third-party complaint against the County, alleging that the County should have to pay to restore the Site. Both Bailey and the United States move for summary judgment on the United States's claim and Bailey's counterclaim, while the County moves for summary judgment on Bailey's third-party claim.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the

---

**3.** Bailey challenged the denial of the permit and lost. *See Bailey v. U.S. Army Corps of* *Eng'rs,* No. 02–639, 2003 WL 21877903 (D.Minn. Aug. 7, 2003).

governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a fact is genuine only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.,* 469 F.3d 1158, 1162 (8th Cir.2006). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and must draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White,* 321 F.3d 710, 715 (8th Cir.2003).

## B. The Corps's Jurisdiction Over the Site

The CWA prohibits the discharge of any "pollutant" from any "point source" into "navigable waters" without a permit. *See* 33 U.S.C. § 1311(a) (prohibiting the "discharge of any pollutant by any person" absent compliance with other sections of the CWA); 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source"). Bailey concedes that the fill and gravel that he placed on the Site during the construction of the Road were pollutants that were discharged from a point source. Bailey also concedes that he discharged those pollutants without getting a permit from the Corps. But Bailey strongly denies that the land onto which he discharged those pollutants is "navigable waters" for purposes of the CWA.

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Under the Corps's regulations, "navigable waters" is not restricted to waters that are navigable. Indeed, it is not even restricted to waters. Rather, "navigable waters" is defined to include "navigable-in-fact" or "traditionally navigable" waters *and* the wetlands that are adjacent to such waters. 33 C.F.R. § 328.3(a)(7). The scope of the Corps's wetlands jurisdiction has been

fiercely litigated in the federal courts, and the issue was addressed by the United States Supreme Court last year in *Rapanos v. United States,* 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006).

### 1. The *Rapanos* Decision

In *Rapanos,* the Court clearly rejected the Corps's argument that it could regulate all wetlands that were anywhere near navigable-in-fact waters. *See id.* at 2257 (Stevens, J., dissenting) (describing the Corps's interpretation of its jurisdiction as covering non-isolated wetlands). Beyond that, however, *Rapanos* left the scope of the Corps's wetlands jurisdiction unclear, in large part because the Court was unable to produce a majority opinion. Instead, Justice Scalia authored a plurality opinion that was joined by three other justices; Justice Stevens authored a dissenting opinion that was joined by three other justices; and Justice Kennedy authored a concurring opinion that was joined by no one.

Writing for the plurality, Justice Scalia held that the Corps could exercise CWA jurisdiction over wetlands when, "[f]irst, ... the adjacent channel contains a 'wate[r] of the United States,' (*i.e.,* a relatively permanent body of water connected to traditional interstate navigable waters); and second, ... the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 2227. In the plurality's view, then, the Corps cannot exercise jurisdiction over Bailey's property unless the Site has a "continuous surface connection" with Lake of the Woods such that it is "difficult to determine" where Lake of the Woods ends and Bailey's land begins. Although the government argues to the contrary, it appears relatively easy to distinguish Bailey's land from Lake of the Woods, and thus it appears that the *Rapanos* plurality

would find that the Corps does not have jurisdiction over the Site.

Unfortunately for Bailey, though, the *Rapanos* plurality was a plurality; a majority of the Court rejected Justice Scalia's analysis. In his concurrence, Justice Kennedy stated that he would find CWA jurisdiction whenever there is a "significant nexus" between the wetlands in question and navigable-in-fact waters. *Rapanos*, 126 S.Ct. at 2248. The test for whether wetlands possess a "significant nexus" to navigable-in-fact waters is whether "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* In Justice Kennedy's view, then, the Corps can exercise jurisdiction over Bailey's land as long as the Site has a "significant [ ][e]ffect" on the "chemical, physical, and biological integrity" of Lake of the Woods.

The *Rapanos* dissenters—unlike the plurality and unlike Justice Kennedy—would have found that CWA jurisdiction existed over the wetlands at issue in the *Rapanos* case itself. In other words, the *Rapanos* dissenters interpreted the CWA to provide wetlands jurisdiction that was broader than the jurisdiction recognized by the plurality and broader than the jurisdiction recognized by Justice Kennedy. Writing for the dissenters, Justice Stevens also made explicit what was implicit in his analysis: The dissenters would find jurisdiction when either the plurality's or Justice Kennedy's test is met. *Id.* at 2265. In other words, if the plurality would find CWA jurisdiction over a particular wetland, so would the four dissenters, meaning that at least eight justices would deem jurisdiction to exist. And if Justice Kennedy would find CWA jurisdiction over a particular wetland, so, too, would the four dissenters, meaning that at least five jus-

tices would deem jurisdiction to exist. Thus, it appears that if *either* the plurality *or* Justice Kennedy would find that the Corps has jurisdiction over Bailey's property, this Court must do likewise. Bailey, however, disagrees.

### 2. The Plurality vs. Justice Kennedy

Bailey argues that, under the approach sanctioned in *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the *Rapanos* plurality opinion alone controls this case. In *Marks*, the Supreme Court said that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" *Marks*, 430 U.S. at 193, 97 S.Ct. 990 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). According to Bailey, the *Rapanos* plurality's test is the "narrowest ground" because the scope of wetlands jurisdiction that it recognized was narrower than the scope of wetlands jurisdiction recognized by Justice Kennedy.

Every court to address the question, however, has either (1) held that Justice Kennedy's opinion is controlling under *Marks* or (2) found that the *Marks* approach is unworkable as applied to *Rapanos* and held instead that the Corps has jurisdiction if either the plurality's test or Justice Kennedy's test is met. *See, e.g., United States v. Johnson*, 467 F.3d 56, 66 (1st Cir.2006); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006) (per curiam), *petition for cert. filed*, No. 06–1331, 75 U.S.L.W. 3556 (Apr. 2, 2007); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir.2007); *United States v. Cundiff*, 480 F.Supp.2d 940, 944 (W.D.Ky.2007); *Sims-*

*bury–Avon Preservation Soc., LLC v. Metacon Gun Club, Inc.,* 472 F.Supp.2d 219, 226–27 (D.Conn.2007); *United States v. Chevron Pipe Line Co.,* 437 F.Supp.2d 605, 613 (N.D.Tex.2006).[4]

The most cogent defense of the latter approach is the First Circuit's opinion in *Johnson,* which describes the shortcomings of using *Marks* to determine the controlling opinion in a case like *Rapanos:*

> "Marks is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." . . .
>
> This understanding of "narrowest grounds" as used in *Marks* does not translate easily to [*Rapanos* ]. The cases in which Justice Kennedy would limit federal jurisdiction are not a subset of the cases in which the plurality would limit jurisdiction.

*Johnson,* 467 F.3d at 63–64 (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc)). Noting that the Supreme Court has moved away from the *Marks* formula, the First Circuit held that, rather than following a literal reading of *Marks,* the better approach is to examine *Rapanos* for a legal standard that, when applied, will produce results with which a majority of the Court would agree. *Id.* at 64–66.

As described above, and as Justice Stevens explained in his dissent, it is clear that at least eight Justices would find wetlands jurisdiction under the CWA when the plurality's test is met, and that at least

five justices would find wetlands jurisdiction under the CWA when Justice Kennedy's test is met. *See Rapanos,* 126 S.Ct. at 2265 (Stevens, J., dissenting) (stating that "[g]iven that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied—on remand each of the judgments should be reinstated if *either* of those tests is met."). This Court will therefore follow the lead of *Johnson* and adopt the approach suggested by Justice Stevens: The United States may establish jurisdiction under either Justice Kennedy's test or the plurality's test.

3. Applying Justice Kennedy's Test

Again, Justice Kennedy would find CWA jurisdiction whenever there is a "significant nexus" between the wetlands in question and navigable-in-fact waters, and he would find such a nexus whenever the wetlands "significantly affect the chemical, physical, and biological integrity" of the navigable-in-fact waters. *Rapanos,* 126 S.Ct. at 2248. Significantly for this case, Justice Kennedy made clear that, when the wetland is "adjacent" to the navigable-in-fact waters, he would find that a significant nexus exists as a matter of law. *Id.* at 2248 ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone.").[5]

**4.** Bailey contends that *Chevron Pipe* applied the plurality's test. A close reading of *Chevron Pipe,* however, indicates that the court assumed that Justice Kennedy's test is controlling, but found that test so ambiguous that it resorted to pre-*Rapanos* circuit precedent for guidance. *Chevron Pipe,* 437 F.Supp.2d at 613.

**5.** Bailey argues that this is a misinterpretation of Justice Kennedy's opinion. Citing *North-*

*ern California River Watch v. City of Healdsburg,* 457 F.3d 1023 (9th Cir.2006), Bailey argues that adjacency alone is not sufficient to meet the "significant nexus" test. Def.'s Mem. Resp. Pl.'s and Third Party's Mots. Summ. J. 4. Bailey is correct that *Northern California River Watch* supports his position, but *Northern California River Watch* simply got it wrong. A careful reading of Justice Kennedy's opinion leaves no doubt that he

The Corps defines "adjacent" to mean "bordering, contiguous, or neighboring" and provides that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c). Justice Kennedy found the Corps's definition of "adjacent" to be reasonable when applied to wetlands adjacent to navigable-in-fact waters. *Rapanos*, 126 S.Ct. at 2245–46. In finding this definition reasonable, Justice Kennedy specifically noted that it may be the *absence* of a hydrological connection between the wetland and the nearby navigable-in-fact waters that creates a significant nexus, because the wetland may prevent polluted waters from reaching the navigable-in-fact waters. *Id.*

All parties agree that Lake of the Woods is a navigable-in-fact water. The question, then, is whether the Road was built on wetlands "adjacent" to Lake of the Woods for purposes of 33 C.F.R. § 328.3(c)—and thus for purposes of Justice Kennedy's test. If it is, then five members of the United States Supreme Court (Justice Kennedy and the four *Rapanos* dissenters) would find that the Corps can exercise jurisdiction over Bailey's property under the CWA.

■ .The Court finds that the Road was built on wetlands "adjacent" to Lake of the Woods for two reasons. First, the Corps has presented evidence that the wetland on the Site extends to the edge of the Lake and thus is "bordering" on or "contiguous" to the Lake. Second, even if there were a factual issue concerning whether the wetland actually extends to the edge of the Lake, the Corps has presented sufficient evidence that the wetland is nevertheless "adjacent" within the meaning of the Corps's definition, because any strip of dry upland separating the wetland and the Lake is akin to the "man-made dikes or barriers, natural river berms, beach dunes and the like" that do not destroy adjacency under 33 C.F.R. § 328.3(c).

### a. The Wetland Extends to the Lake

Regardless of the presence of adjacent wetlands, the Corps's jurisdiction over waters of the United States extends to the ordinary high-water mark ("OHWM") of non-tidal waters. 33 C.F.R. § 328.4(c)(1). The OHWM is defined as

> that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

33 C.F.R. § 328.3(e). The OHWM of Lake of the Woods is typically at the midpoint or higher on the cut bank of the shoreline, Eggers Decl. ¶ 30, and the Corps's jurisdiction thus extends to that point, even without the existence of an adjacent wetland.

The Corps defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency

---

distinguishes between wetlands adjacent to navigable-in-fact waters (in which case adjacency alone *is* sufficient to establish jurisdiction) and wetlands adjacent to nonnavigable *tributaries* of navigable-in-fact waters (in which case the Corps must introduce evidence establishing a significant nexus). *Rapanos*, 126 S.Ct. at 2248–49; *see also United States v. Fabian*, 522 F.Supp.2d 1078, 1091,

2007 WL 1035078, at *13 (N.D.Ind.2007) (noting the Ninth Circuit's erroneous reading of *Rapanos*). Indeed, the Ninth Circuit recently withdrew its original opinion in *Northern California River Watch* and issued a new opinion clarifying that adjacency to a navigable-in-fact water is sufficient. *N. Cal. River Watch*, at 999–1000.

and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). To conduct "wetlands delineations"—that is, formal identifications of the presence and extent of wetlands for the purpose of determining jurisdiction over them—the Corps uses the criteria set forth in the 1987 Corps of Engineers Wetlands Delineation Manual ("1987 Manual") and Corps memoranda interpreting the 1987 Manual.[6] Eggers Decl. Ex. X ¶ 2.A.

In general, the 1987 Manual defines land as wetland when, under normal conditions:

1. The land consists of hydric soils (soils formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part of the soil);

2. The land has wetland hydrology (inundation or saturation of soils for at least 5% of the growing season in most years); and

3. The land is dominated by hydrophytic vegetation (plants that have the ability to grow, effectively compete, reproduce, and/or persist in anaerobic soil conditions caused by inundated or saturated soil conditions).

Eggers Decl. ¶¶ 9–12 & Ex. X ¶¶ 2.A2.D. In other words, to determine whether a particular piece of property is wetland, the Corps looks at soil, water, and plants. To establish wetland hydrology (the second factor), the Corps requires either a primary indicator (such as direct observation of saturation within twelve inches of the surface) or two secondary indicators (such as the FAC-neutral test and local soil survey data (explained below)). Eggers Decl. Ex. X ¶ 2.D.

In this case, the Corps presents expert evidence from three people: Steve Eggers, a senior ecologist with the Corps; Rod Heschke, a soil scientist with the United States Department of Agriculture; and Kelly Urbanek, a senior project manager and biologist with the Corps. *See* Eggers Decl. Exs. X, Y. Eggers and Heschke conducted wetlands delineations at the Site in August 2000 and May 2006. Eggers Decl. Ex. X ¶ 3.A. Urbanek accompanied Eggers and Heschke during the May 2006 delineation, and Urbanek and several other representatives of the Corps conducted a third site inspection on October 19, 2006. Eggers Decl. Ex. X ¶ 3.A; *id.* Ex. Y ¶ 2.0.

In conducting wetlands delineations, the Corps's general rule is to establish at least one sample point where a change in soils, hydrology, vegetation, or topography occurs. Eggers Decl. Ex. X ¶ 3.B. In total, Eggers and Heschke established forty-six sample points at the Site along a number of transects extending west from the Lake. Eggers Decl. Ex. X ¶ 3.B & Figs. 3, 4. At each sample point, Eggers and Heschke dug depressions in the ground to check soil types and saturation levels. Eggers Decl. Ex. X ¶¶ 4.B(2), 4.E. To check for hydrophytic vegetation, Eggers and Heschke sampled plant species around each sample point in a five-foot radius (in the case of herbaceous species) and a thirty-foot radius (in the case of saplings and shrubs). Eggers Decl. Ex. X ¶ 4.F. They also counted trees. *Id.* Eggers selected representative sample points and located additional points where he observed changes in vegetation. Eggers Decl. ¶ 38.

Thirteen of the sample points were within 15 to 101 feet of the cut bank of the shoreline. Eggers Decl. Ex. X ¶ 4.H. All thirteen of these sample points contained

---

6. An updated, on-line edition of the 1987 Manual may be found at http://el.erdc. usace.army.mil/wetlands/pdfs/wlman87.pdf.

hydric soils and were dominated by hydrophytic vegetation. *Id.* Eleven of the thirteen points had a primary indicator of wetland hydrology (saturation within twelve inches of the surface). *Id.* A twelfth had two secondary indicators of wetland hydrology (the FAC-neutral test and local soil survey data).[7] Eggers Decl. Ex. X ¶¶ 4.B(2), 4.H. The thirteenth sample point, which lacked sufficient indicators of wetland hydrology, is located in a corridor on the southern boundary of the plat that extends westward from the shore of the Lake and encompasses most of lot 1. Eggers Decl. Ex. X ¶¶ 4.G, 4.H & Fig. 8. Eggers and Heschke determined that this corridor, which is drained by a preexisting ditch, is not wetland. *Id.*

Based on their observations and on photographs of the Site, Eggers and Heschke opine that the entire Sunny Beach plat is wetland, with the exception of a small "island" straddling lots 3 and 4 and the corridor that encompasses most of lot 1. Eggers Decl. Ex. X ¶ 4.G & Fig. 8. The wetland at the Site includes nearly all of the land on which Bailey built the Road, *id.*, and extends to the cut bank of the Lake, Eggers Decl. ¶ 38. The vegetation of the wetland extends to, and sometimes below, the OHWM. Eggers Decl. ¶ 30.

Bailey makes a lackluster attempt to dispute whether the wetlands criteria in the 1987 Manual are met. For example, Bailey contends that there is no soil saturation within one foot of the surface for 5% of the growing season, that there is a lack

of soil saturation within 100 feet of the Lake (thus creating a barrier between the wetland and the Lake), and that the first 100 feet from the Lake is upland. Def.'s Mem. Supp. Mot. Summ. J. 4, 6. Bailey cites no record support for these particular assertions, however, and the primary evidence he offers in support of his assertions about the non-wetland characteristics of the Site is his own affidavit. Bailey has a bachelor's degree in marketing and finance and disavows any expertise in identifying wetlands. Bailey Dep. 73–74. He obviously lacks the expertise necessary to identify what portions of the Site are wetlands. Although Bailey, like any other non-expert, is competent to testify about his direct observations of the Site, he has failed to show that any of his observations are relevant to determining to what extent the Site is a wetland as defined in the 1987 Manual.

At various points in his briefing, Bailey also cites to documents and testimony that reflect the opinions of Gary Lockner (the County environmental services director) and other County and state officials, who at one time concluded that there was no wetland within 100 feet of the Lake. *See, e.g.*, Def.'s Answer Ex. 1 at 498–516 (transcripts of Lockner's testimony from a state administrative proceeding); Koschak Dep. Ex. 60, Dec. 2, 2004 (October 14, 1999 letter from Lockner to the Minnesota Pollution Control Agency opining that the water table was lower than 12 inches below the surface within 100 feet of the Lake). Putting aside the fact that much of this evidence is inadmissible,[8] none of these

---

**7.** An area meets the FAC-neutral test if plants that "almost always" (greater than 99% probability) and "usually" (67% to 99% probability) grow in wetlands outnumber plants that almost always or usually grow in non-wetlands. Eggers Decl. ¶ 14(1) & Ex. X at Table 1. The local soil survey data indicates that the soil types at the Site are Wabanica silt loam and Zippel very fine sandy loam, which are both categorized as hydric soils. Heschke Decl. ¶ 7(A), Jan. 29, 2007. Heschke found

hydric soils at every sample point, with the exception of one sample point located within the upland "island" straddling lots 3 and 4. Heschke Decl. ¶ 7(B), Jan. 29, 2007.

**8.** Much of this evidence (for example, Lockner's testimony at a state administrative proceeding and Lockner's August 25–26, 2005 deposition in a state case) is clearly hearsay and does not come within the hearsay exception for former testimony. *See* Fed.R.Evid.

individuals has been identified as an expert in this case, nor did any of them conduct a formal delineation of the Site. Instead, they came to their conclusions on the basis of a single soil sample that happened to come from the upland "island" on the Site. These officials (apparently with the exception of Lockner) later concluded that the soil sample did not accurately represent the soil conditions of the entire 100–foot corridor of land nearest the Lake. Bailey Aff. Ex. 2 at 7 ¶¶ 17–18, Aug. 3, 2006. Insofar as this evidence is offered to prove that the 100–foot corridor of land nearest the Lake is not wetland, it is patently unreliable and thus inadmissible under Fed.R.Evid. 702.

Rather than offering competing expert evidence of the hydrologic characteristics of the Site, Bailey focuses his efforts on disputing whether the United States has offered sufficient evidence that the wetland extends to the Lake. Specifically, Bailey argues that Eggers failed to establish any sample points within fifteen feet of the Lake and that therefore the United States has failed to prove that the wetland is adjacent to the Lake.

Eggers established sample points where he observed changes in vegetation. He did not establish any sample points within fifteen feet of the Lake because he observed no changes in vegetation between the Lake and the sample points closest to the Lake. Eggers Decl. ¶ 38; Eggers Dep. 59–60, Nov. 16, 2006 ("Eggers Dep."). Moreover, Eggers relies not only on primary indicators of wetland hydrology (direct observation of saturated soil), but also on secondary indicators of wetland hydrology (the FAC-neutral test and local soil

survey data). Eggers found that the FAC-neutral test was met close to the Lake through his own observation. Eggers Decl. ¶ 38; Eggers Dep. 59–60. True, Eggers did not formally sample herbaceous vegetation beyond the five-foot radius surrounding each sample point, but he did sample saplings and shrubs in a thirty-foot radius around each sample point, and he observed no changes in vegetation closer to the Lake that would have necessitated additional sample points. As for the other secondary indicator (local soil survey data), Heschke concluded, based on his observations of the Site, the local soil survey data, and the prevalence of hydric soils in the surrounding area, that the soils within fifteen feet of the Lake are hydric. Heschke Decl. ¶ 8, Jan. 29, 2007. Thus, the Corps has offered sufficient evidence for a factfinder to conclude that the wetland is adjacent to the Lake—which, under Justice Kennedy's test, means that the Corps can exercise jurisdiction over it. As Bailey offers no competent evidence to the contrary, the United States is entitled to summary judgment on this issue.

*b. Separation by a Fifteen–Foot Strip of Land Does Not Destroy Adjacency*

■ Alternatively, even if the Corps's evidence is insufficient to establish that the fifteen feet of land just west of the cut bank is wetland, the Corps's definition of "adjacency"—which Justice Kennedy found reasonable, *Rapanos,* 126 S.Ct. at 2245–46—is broad enough to include the wetland west of that fifteen-foot corridor. The Corps's definition of "adjacency" makes clear that some separation of wetlands and navigable-in-fact waters does not destroy adjacency. 33 C.F.R. § 328.3(c).

804(b)(1) (permitting the admission of former testimony if the declarant is unavailable as a witness and the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony). The United States has not objected to Bailey's

introduction of this testimony, however, and in general the parties have relied without objection on depositions and other testimony taken in the course of the many other proceedings that have been spawned by Bailey's actions and litigiousness.

Bailey argues that the examples of barriers in the regulation—"man-made dikes or barriers, natural river berms, beach dunes and the like"—are all either artificial (thus interrupting what would have been a natural hydrological connection) or indicate the movement of water (thus implying a hydrological connection). As Justice Kennedy explained, however, the Corps's jurisdiction over adjacent wetlands does not require a hydrological connection. *Rapanos*, 126 S.Ct. at 2245–46. Because wetlands sometimes protect adjacent waters by absorbing flood water and impurities, the *absence* of a hydrological connection in those cases is the reason why the wetland has a significant nexus with the navigable water. *Id.*

Bailey's theory is that the Lake draws down the water table of the adjoining land, thus creating a barrier of non-wetland around the shore. Assuming (contrary to the evidence) that this is true, that barrier is exactly the type of separation that does not destroy adjacency under § 328.3(c). Bailey points out that the Corps refused to indicate what the outer limit of "adjacency" might be. Although another case might require a precise answer to that question, a wetland abutting a fifteen-foot corridor of land drained by the navigable water is well within any conceivable outer limit. Thus, even if the Corps has failed to prove that the wetland is actually "bordering" on or "contiguous" to the Lake, the wetland is still adjacent to the Lake within the meaning of § 328.3(c), and the Corps has properly exercised jurisdiction over it.

#### 4. Request to Exclude

Bailey asks the Court to disregard Eggers's November 9, 2006 supplemental expert report because it was served after the October 1, 2006 expert-disclosure deadline. *See* Docket No. 35 at 3. The facts relevant to this request are as follows:

On September 1, 2006, the United States asked Bailey for permission to conduct a third site inspection, but Bailey did not cooperate and the United States ultimately brought a motion to compel entry on land. Chief Magistrate Judge Raymond L. Erickson granted the motion on October 13, *see* Docket No. 56, and Bailey did not appeal that order. The United States conducted the third inspection on October 19, and Eggers's November 9, 2006 supplemental report sets forth the findings and conclusions from that inspection.

Bailey argues that the November 9 report is untimely and that the United States did not disclose Rod Heschke, the soils scientist, as an expert before serving the report. As the foregoing makes clear, however, the supplemental report was untimely only because Bailey himself refused to give the government access to the Site. Bailey also fails to cite any prejudice caused by the untimeliness of the report. He had access to the report before deposing Eggers and long before the hearing on the pending motions. In addition, whether or not the United States fully complied with the expert-disclosure requirements of Fed.R.Civ.P. 26(a)(2) with respect to Heschke before November 9, Heschke was clearly identified as a soils scientist and author of the original report, and his identity and role were thus no surprise to Bailey. The Court therefore rejects Bailey's attempt to exclude the supplemental report.

#### 5. Rule 702 Challenge

As an alternative to his argument that the November 9 report is untimely, Bailey argues that Eggers's opinion that the wetland extends to the Lake is inadmissible under Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Bailey argues that Eggers's opinion that the wetland extends to the Lake is unreliable under Rule 702 for two reasons: (1) the Corps uses facultative plants as an indicator of the presence of hydrophytic vegetation, and (2) Eggers failed to consider the drainage effect of the Lake on the land nearest the Lake. The Court considers each argument in turn.

### a. The Use of Facultative Plants

To identify the presence of hydrophytic vegetation, the Corps uses a list of plant species published by the United States Fish and Wildlife Service ("the USFWS"). Eggers Decl. Ex. X ¶ 2.C. The USFWS categorizes plant species according to the probability that they will grow in wetlands as compared to the probability that they will grow in non-wetlands. Eggers Decl. Ex. X ¶ 2.C. According to the 1987 Manual, hydrophytic vegetation is present if more than 50% of the dominant plant species are "obligate wetland plants" (which grow in wetlands more than 99% of the time), "facultative wetland plants" (which grow in wetlands 67–99% of the time), or "facultative plants" (which grow in wetlands 33–67% of the time). Eggers Decl. Ex. X ¶ 2.C & Table 1. The Corps further distinguishes between plants in the facultative categories by assigning a positive (+) or a negative (-) to indicate the wetter and drier ends of the categories. Eggers Decl. Ex. X Table 1. In determining whether hydrophytic vegetation is present, the Corps excludes plants in the negative (-) facultative category. Eggers Decl. Ex. X ¶ 2.C.

Bailey argues that using facultative plants as an indicator of wetlands renders the Corps's conclusions unreliable because such plants are equally likely to grow in non-wetlands. As explained above, however, the presence of hydrophytic vegetation is just one of three criteria used to define wetlands (the other two being hydric soils and wetland hydrology). Thus, while the mere presence of facultative plants may mean that the area has only a 50% likelihood of being wetlands, the Corps's use of additional criteria ensures that its method of distinguishing wetlands from non-wetlands is reliable. Moreover, even if it is theoretically possible for the Corps to conclude that hydrophytic vegetation is present solely on the basis of facultative plants, the Corps did not do so in this case. The Corps found obligate wetland plants and facultative wetland plants, both of which are much more likely to grow in wetlands than in non-wetlands. Eggers Decl. Ex. X Tables 1, 2. Finally, the Corps does not use *all* facultative plants as indicators of hydrophytic vegetation; instead, the Corps considers only those facultative plants that are on the wetter end of the facultative spectrum.

More importantly, in challenging the Corps's use of facultative plants to identify wetlands, Bailey is really challenging the Corps's definition of wetlands. The purpose of the 1987 Manual, which permits the use of facultative plants to identify wetlands, is to delineate wetlands for jurisdictional purposes. Bailey's challenge is therefore not really a *Daubert* challenge; it is more akin to an argument that the Corps's definition of wetlands in the 1987 Manual is unreasonable. Congress has provided, however, that the Corps shall continue to use the 1987 Manu-

al until a final wetlands-delineation manual is adopted after notice and public comment. Energy and Water Development Appropriations Act, 1993, Pub.L. No. 102–377, 106 Stat. 1315 (1992). Even aside from this Congressional mandate, the 1987 Manual is entitled to deference, whether it is viewed as an interpretation by the Corps of its own regulations, or as a long-standing technical interpretation that is within the Corps's particular expertise. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 219, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (an agency's reasonable interpretation of its own regulations is entitled to deference); *United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (noting that courts accord deference to agency interpretations in keeping with the degree of the agency's care, the consistency, formality, and persuasiveness of its position, and the extent to which the subject is a technical one within the agency's area of expertise). *Cf. United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (noting that the Corps is entitled to deference in its construction of the CWA). The Court therefore rejects Bailey's challenge to the Corps's use of facultative plants as an indicator of the presence of hydrophytic vegetation.

### b. Failure to Consider Drainage Effect of the Lake

■ Bailey next argues that Eggers's opinion that the wetland extends to the Lake is unreliable because Eggers refused to consider the drainage effect of the Lake on the surrounding land. In the original report, Eggers used something called the "van Schilfgaarde equation" to estimate the impact of man-made ditches on the Site. According to this equation, a two-foot-deep ditch in Wabanica soils (one of the soil types found on the Site) would have a lateral drainage effect of 105 feet.

Eggers Decl. Ex. X ¶ 4.D. During Eggers's deposition, he was asked whether the drop in elevation at the cut bank of the Lake would similarly drain the surrounding lakeshore. Eggers Dep. 71–74. Eggers testified that he had never heard of using the van Schilfgaarde equation to determine the drainage effect of a *lake* and that he thought it would be inappropriate to do so. Eggers Dep. 72–73.

Bailey points to testimony by County environmental services director Gary Lockner, in which Lockner described using a chart—apparently a chart that was based on the van Schilfgaarde equation—to estimate the drainage effect of Lake of the Woods on surrounding land. Def.'s Answer Ex. 1 at 498–516. But, as noted above, Lockner has not been qualified as an expert in this case; Lockner did not conduct a wetlands delineation of the Site; and there is no evidence that he knows what he is doing in using the van Schilfgaarde equation in estimating the drainage effect of a huge natural lake, as opposed to relatively small man-made ditches.

Eggers conducted the delineation according to the standards set out in the 1987 Manual. In keeping with those standards, Eggers relied on his own observation of both primary and secondary indicators of wetland hydrology. Bailey has not pointed to anything in the 1987 Manual requiring the Corps to determine wetland hydrology on the basis of the possible drainage effect of a neighboring lake, much less anything requiring the Corps to use the van Schilfgaarde equation to estimate the drainage effect of a lake. Nor has Bailey offered any competent evidence that it is appropriate to use the van Schilfgaarde equation to estimate the drainage effect of lakes. In short, nothing in the record indicates that Eggers's failure to apply the van Schilfgaarde equation to Lake of the Woods renders his opinions

unreliable. Finally, the Court notes that, even if it excluded Eggers's opinion that the wetland includes the fifteen feet nearest the edge of the Lake, the Corps has still offered sufficient evidence that the wetland is "adjacent" to the Lake within the meaning of its regulations and thus within CWA jurisdiction under Justice Kennedy's test.

### C. Other Challenges to the Corp's Assertion of Jurisdiction

Bailey raises several other arguments challenging the Corps's assertion of jurisdiction over the Site, all of which are plainly meritless.

■ First, Bailey argues that the Corps has unconstitutionally invaded an area of authority reserved to the states. Essentially, Bailey argues that the County's approval of the plat precludes the Corps from enforcing the CWA. This claim is frivolous. Under the Supremacy Clause, a board of county commissioners obviously cannot block the enforcement of federal environmental laws by platting a parcel of wetland. U.S. Const. Art. VI, cl. 2.

■ Second, Bailey argues that, in directing the restoration order to him rather than to the County, the Corps has acted arbitrarily and capriciously within the meaning of the Administrative Procedure Act. See 5 U.S.C. §§ 702, 706(2) (persons harmed by arbitrary and capricious agency action are entitled to judicial review of that action). Agency action is "arbitrary and capricious" only when it lacks any rational basis. *Falk v. United States* ex rel. *Dep't of Interior*, 452 F.3d 951, 953 (8th Cir.2006). As discussed below, the Corps had ample reason to direct the restoration order solely at Bailey, and thus its action was not arbitrary or capricious.

Finally, Bailey argues that the Corps has violated the Equal Protection Clause by administering its regulations in a disparate manner. Bailey points out that the preexisting County road to the north of the Site (to which the Road connects) was built without a Section 404 permit. Bailey complains that, when the County applied for an after-the-fact permit for that preexisting road, the Corps apparently permitted the County to mitigate, rather than requiring restoration.[9] Yet when Bailey applied for an after-the-fact permit for his road, the Corps required restoration. Thus, Bailey claims, the Corps violated the Equal Protection Clause by treating him less favorably than the County.

■ Bailey is incorrect. To make out a violation of the Equal Protection Clause, Bailey would have to show that he was similarly situated to the County and that the Corps's disparate treatment of the two lacked a rational basis. *Geach v. Chertoff*, 444 F.3d 940, 945 (8th Cir.2006). Bailey has not made such a showing. The County applied for an after-the-fact permit for a road that had been in existence for many years and that served many long-time residents—a road that apparently was not built in knowing defiance of the law. Bailey applied for an after-the-fact permit for a brand-new road that served almost no one—a road that Bailey persisted in building despite being warned that he was breaking the law. Under these circumstances, it is obviously not irrational for the Corps to treat Bailey differently from the County.

### D. The Restoration Order

The Court has found, for the reasons described at length above, that the Corps does indeed have jurisdiction over the Site under the CWA. Other than disputing the jurisdiction of the Corps, Bailey does not

---

9. The portion of the record to which Bailey cites does not indicate what became of the County's after-the-fact permit application. *See* Hasbargen Dep. 55–64, Aug. 26, 2005.

deny that construction of the Road violated the CWA—and thus Bailey does not deny that the United States is entitled to relief of *some* type. But Bailey raises a host of challenges to the particular restoration order entered against him on October 22, 2001—the restoration order that the United States now asks this Court to enforce.

▮ The CWA authorizes injunctive relief for violations of § 1311(a). 33 U.S.C. § 1319(b). Both the United States and Bailey have addressed the propriety of injunctive relief under the standards set forth in *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir.1976). Under the *Sexton Cove* line of cases, a restoration plan must: (1) be designed to confer maximum environmental benefits tempered with a touch of equity; (2) be practical and feasible from an environmental and engineering standpoint; (3) take into consideration the financial resources of the defendant; and (4) include consideration of the defendant's objections. *Id.* at 1301; *see also United States v. S. Inv. Co.*, 876 F.2d 606, 615 (8th Cir.1989).

On June 12, 2001, the same day that the Corps denied Bailey's after-the-fact permit application, the Corps issued a public notice soliciting input on the "potential environmental remedy/solution for the unauthorized road fill." AR at COE0623–0624. The Corps received a number of responses to this public notice. AR at COE0638–0660. While the Corps was considering possible remedies, Bailey proposed a mitigation plan, AR at COE0663–0665, which the Corps considered and rejected (along with Bailey's original mitigation plan proposed as part of his Section 404 permit application). AR at COE0675–0676. The Corps explained that Bailey's proposed mitigation plans were inadequate because they would result in a net loss of wetland function. *Id.*

After considering the responses to its public notice and the *Sexton Cove* factors,

the Corps ordered restoration of the wetland. AR at COE0700–01. Specifically, the Corps ordered Bailey to: (1) remove the dredged and fill material used in construction of the Road; (2) fill in the ditches; (3) seed the restored area with a specified seed mixture; and (4) for three years following restoration, control certain weed species via hand removal or spot use of an herbicide approved for wetland use. *Id.* The Corps found, and Bailey does not dispute, that removal of the Road can be accomplished using the same equipment that was used to clear the roadbed. *Id.* The Corps also found that restoration would confer maximum environmental benefits because it would reestablish a high-quality wetland near an important international waterbody. *Id.; see also* Eggers Decl. Ex. X ¶ 5.A (giving a rating of "high" to 5 out of 11 wetland functions of the subject wetland, including vegetative diversity, downstream water quality, and wetland water quality).

Bailey does not seriously dispute that restoration, as outlined in the restoration order, would provide the maximum possible environmental benefit, nor does he dispute that restoration is practical and feasible from an environmental and engineering standpoint. Bailey also does not argue that restoration is beyond his financial means; in fact, Bailey conceded at oral argument that removing the Road will probably not cost much more than building the Road did. Although Bailey argues that it is not practical to restore the wetland because it would take twenty-five years for newly planted trees to mature, from an environmental standpoint twenty-five years is but the blink of an eye. Moreover, long before the trees have matured, the wetland will serve to enhance water quality by trapping and filtering runoff. Eggers Decl. Ex. X ¶¶ 5.A, 6.A.

The focus of Bailey's *Sexton Cove* argument is that the restoration order is ineq-

uitable. To hear Bailey tell it, the County directed Bailey to build the Road, yet now is unfairly trying to duck responsibility for it. Bailey emphasizes the County's actions in approving the Sunny Beach plat, informing Bailey how to build the Road to County standards, requiring Bailey to post a bond, and issuing permits for culverts to individuals who purchased lots from Bailey. Bailey argues that the County took over the Road and the responsibility for obtaining the required permit. Bailey notes that the County has performed some maintenance work on the Road, and has even widened and seeded the ditches, and Bailey points out that LaValla obtained some of the gravel for the Road from a County gravel pit. Because the County was so heavily involved with the Road, Bailey contends, the Corps acted inequitably in failing to require the County to restore the wetland.

An examination of the record demonstrates that Bailey's contentions are meritless. The undisputed fact is that, at all relevant times, Bailey and Bailey alone was the driving force behind the creation of the Road. It was Bailey's decision to clear the sixty-six-foot wide roadway through the wetland and build the Road. It was Bailey who hired LaValla to perform the work. It was Bailey who told LaValla to resume the work after LaValla had been told to stop. And it was Bailey who stood to profit from the construction of the Road.

Bailey did have extensive interactions with the County, but the focus of those interactions was *not* on the Road's compliance or lack of compliance with federal environmental standards—something that the County had no authority to address. Rather, the focus of Bailey's interaction with the County was on getting the land platted and getting the County to take over responsibility for maintaining the Road. None of this makes the County responsible for Bailey's violations of the CWA. At every step of the way, Bailey was well aware, as he had been since at least 1993, that he needed a Section 404 permit to place fill on the Site. AR at COE0049. He chose to defy the law by starting construction on the Road without a permit, and then he chose to defy the law again by resuming work after the Corps told him to stop.

Bailey implies that the County led him to believe that it would obtain the Section 404 permit on his behalf and that he finished the Road in reliance on the County's promise. The timing of events, however, belies this claim. The work on the Road was performed in three stages: During the initial stage, in June 1998, LaValla cleared the roadway and began building the Road. This stage was interrupted when LaValla and Bailey were told to stop work on the Road. At some point later that summer, Bailey instructed LaValla to finish building the Road. Although the record is not entirely clear as to when LaValla completed this second stage of the work—Bailey must know, but fails to mention this fact in his briefing—the record reflects that the Road was completed sometime before September 17, 1998, when the Corps notified Bailey in writing that the completed Road violated the CWA. Bailey Dep. Ex. 6. The third stage of work took place in 1999, when LaValla upgraded the Road by replacing the culverts and adding gravel.

There is no evidence that Bailey sought input from the County before he cleared the roadway and began building the Road in June 1998, so it is difficult to know how the County could be blamed for that. Bailey does try to blame the County for his decision to resume construction of the Road during the late summer of 1998. Specifically, Bailey claims that, after he stopped work on the Road, the County instructed him to complete it. In support

of his claim, Bailey points to a September 16, 1998 letter from the County to Bailey. *See* Def.'s Mem. Resp. to Pl.'s and Third Party's Mot. Summ. J. 24; Bailey Dep. Ex. 5 (Sept. 16, 1998 letter from the County to Bailey stating "[p]er your telephone request, I inspected your road construction ... for compliance with [county standards].... Before recommendation to the County Board for acceptance as an unorganized Township Road, all of these deficiencies would have to be addressed.").

There are two problems with Bailey's argument. First, as described above, the Road was essentially completed by the time that Bailey received the County's September 16 letter. Obviously, then, Bailey did not rely on the letter in ordering LaValla to resume construction. Second, the September 16 letter does not, in fact, instruct Bailey to complete the Road. Rather, the letter reflects that Bailey solicited the County's input on how to build the Road to County standards because *Bailey* wanted the County to take over the Road. The fact that a government informs a citizen of the legal requirements for taking a certain action does not mean that the government is thereby *directing* the citizen to take that action, much less assuming legal responsibility for the citizen's violation of federal law. If, for example, Bailey had asked what kind of building permit he needed before constructing a restaurant on the Site, and the County responded, that would be a far cry from the County "instructing" Bailey to build a restaurant.

Bailey also claims that Doug Easthouse of the Soil and Water Conservation District told him that the Corps would approve the application and that he was free to finish the Road. Bailey Dep. 46. Putting aside the fact that Easthouse did not work for the federal government and thus did not have authority to make decisions on behalf of the Corps, Easthouse also did not work for the County, and thus his actions cannot be blamed on the County. *See* Minn.Stat. § 103C.331, subd. 1 (soil and water conservation districts are governmental and political subdivisions of the state). More importantly, Bailey was told in June 1998 by the federal government— both the Corps and the EPA—to cease work on the Road until he obtained the proper permit from the Corps. AR at COE0438. It defies belief that Bailey, after being told by the *Corps* to stop work on the Road until he got a permit from the *Corps*, would resume work on the road without checking first with the *Corps*. Thus, even under the most charitable reading of the record, Bailey cannot claim ignorance of the fact that any additional work would be at his own risk.[10] *Cf. Sexton Cove*, 526 F.2d at 1300 (developers who did not contact the Corps before beginning construction, and were later notified that a permit was required, were not misled into believing that they were exempt from permit requirements).

Bailey next argues that the restoration order is inequitable because it requires

---

10. Bailey also cites a May 1, 2006 order of state district-court judge Charles H. LeDuc as evidence that the County induced Bailey to build the Road. Fish Decl. Ex. 10, March 5, 2007. Judge LeDuc dismissed *criminal* charges brought against Bailey by the *state* on the basis of equitable estoppel, apparently concluding that the County bore some responsibility for development at the Site. (It is not entirely clear what Bailey was charged with, but it appears that he was charged with violating state environmental law.) Judge Le-

Duc did not cite any evidence that the County induced Bailey to build the Road, but simply relied on Bailey's memorandum in support of dismissing the charges. *Id.* at 3. Nowhere in that memorandum did Bailey point to any evidence that the County induced Bailey to build the Road. Moreover, the United States was not a party to that action, and it does not appear that Judge LeDuc had the benefit of the evidence of Bailey's culpability that the United States has presented in this case.

him to remove items placed on the land by others. Specifically, Bailey identifies culverts and fill placed by owners of the lots on the Site, a culvert and fill that the County allegedly placed on the Site, the seeding of the ditches by the County, and road grading by the County. Bailey also argues that the County widened the ditches and used the excavated material for more road base.[11]

Even assuming that Bailey's factual allegations are true, it is not inequitable for Bailey to be required to remove these items in conjunction with his removal of the Road. The United States is seeking the removal of a quarter-mile long road that runs through a sixty-six-foot wide roadway, for which Bailey is entirely responsible. In comparison, the burden of removing a few additional items is minimal. Moreover, Bailey bears some share of the responsibility for these items. Obviously, if he had not built the Road, *none* of these items would now be on the Site.

Bailey is directly responsible for some items, such as the gravel placed on the Road by LaValla in 1999. Other items, such as most of the culverts, were placed near the Road by those to whom Bailey sold lots. Bailey apparently did not tell these purchasers that he did not have the necessary permit for the Road and that, in fact, he might be required to remove the Road. He can hardly be heard to complain now about having to remove a few culverts

that these innocent lot owners placed near the Road; the fact that the County issued permits to the lot owners to place these culverts does not make Bailey any less culpable. *Cf. United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1165 (1st Cir.1987) (finding that the restoration order was equitable because, while it placed a "heavy burden" on the defendant, the defendant had no one but itself to blame for its predicament).

Bailey cites to County timesheets as evidence that the County placed fill on the Road, but these timesheets do not distinguish between Sandy Shores Drive and the Road, and thus there is no proof that the County placed fill on the Road. Hasbargen Dep. 11–12, Aug. 26, 2005. Although there is some evidence that the County widened the ditches, *see* Fish–Whitlock Aff. Ex. 9, Jan. 25, 2006, that widening (along with the seeding of the ditches) will have little impact on the cost to Bailey of restoring the Site. Finally, with respect to the preexisting culvert to the north of the Road, the restoration order does not include that culvert, and the fact that the County placed it there is therefore irrelevant. AR at COE0703 (map attached to restoration order showing the area to be restored).

Bailey also argues—and the County concedes—that the County has owned the Road since December 1998, when the County Board approved the Sunny Beach plat.[12] Bailey and the County make de-

---

**11.** Bailey also identifies other items, such as spoil that the County cast onto his land when it recently cleaned the ditch on the southern border of the Site. The spoil was not cast onto the Road, however, and Bailey is not being asked to remove it. *See* Crompton Dep. 13, Nov. 28, 2006 ("Q. [The spoil] was placed into the farmer's field? A. Yes.").

**12.** Bailey argues that the United States has taken inconsistent positions with respect to Bailey's ownership of the Road. *See* Def.'s Mem. Resp. Pl.'s and Third Party's Mots.

Summ. J. 23. Specifically, Bailey claims that the United States has argued, in a pending takings case in the Federal Court of Claims, that Bailey has no interest in the Road. *Id.* The United States has moved to supplement the record with a copy of Bailey's memorandum in the takings case, which the Court grants. Pointing to that memorandum, the United States argues that it is *Bailey* who has taken inconsistent positions with respect to his ownership interest in the Road. Each side apparently seeks to estop the other from taking an inconsistent position in this case. The

tailed arguments about state property law with respect to public roads. But nowhere does Bailey explain why the current ownership of the Road is relevant under the CWA. There is no doubt that it was *Bailey* who violated the CWA, and nothing in the statute or the case law interpreting it suggests that Bailey can escape liability by passing the Road on to the County. Certainly, a violator's lack of continuing control over polluted property may be relevant to whether restoration is practical. But the practicality of restoration is not a problem in this case, as the County represented at oral argument that it will take all steps necessary to allow Bailey to comply with the restoration order.

■ The Court therefore concludes that the Corps's restoration order meets all of the requirements of *Sexton Cove,* and the Court will enter an injunction requiring Bailey to comply with that order. The Court will not, however, enjoin Bailey from discharging further pollutants into the Site, as the government requests. Before the Court could enter such an order, the United States would have to show the likelihood of a *future* CWA violation by Bailey. *See, e.g., United States v. Sea Bay Dev. Corp.,* No. 06–624, 2007 WL 1378544, at *3 (E.D.Va. May 8, 2007); *United States v. Fabian,* 522 F.Supp.2d 1078, 1094–95, 2007 WL 1035078, at *17 (N.D.Ind. Mar. 2, 2007). The United States has made no such showing. True, Bailey has demonstrated a willingness to defy the instructions of the Corps, but he did so while his permit application was pending, and there is no suggestion that Bailey intends to place more fill on the Site or otherwise violate the CWA. An

injunction prohibiting him from doing so is therefore unwarranted.[13] *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 193, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (federal courts should narrowly frame relief to fit the precise facts of the case); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (courts retain discretion to grant or deny injunctions restraining violations of the CWA).

### E. Bailey's Claim Against the County

The United States filed this action against Bailey in September 2005. In January 2006, Bailey moved to join the County as a third-party defendant under Fed. R.Civ.P. 19. Docket No. 14. Judge Erickson found that joinder of the County was not proper under Rule 19, but granted Bailey permission to implead the County under Fed.R.Civ.P. 14. Docket No. 25. Contrary to Bailey's representation at oral argument, Judge Erickson did not *order* Bailey to implead the County under Rule 14. Indeed, Judge Erickson expressly noted that the Court might ultimately find Bailey's Rule 14 allegations unsustainable. *Id.* at 18. Bailey did not object to the denial of his Rule 19 motion, but instead brought a third-party complaint against the County under Rule 14.

■ In his third-party complaint, Bailey alleges that the County is responsible for the CWA violation, and asks that the Court order the County—*instead* of Bailey—to restore the wetland at its own expense in the event that the United States prevails on its claim. Docket No. 26. This, however, is not a proper basis

Court need not involve itself in this skirmish, however, because the nature of Bailey's property rights over the Road is irrelevant.

13. The United States cites only one district-court case for the proposition that it is entitled to an injunction restraining Bailey from

future violations. *See Leslie Salt Co. v. United States,* 820 F.Supp. 478, 484 (N.D.Cal.1992). The court in *Leslie Salt* did not cite any authority or provide any analysis supporting its conclusion, and thus its opinion is not persuasive.

for a Rule 14 claim. A defendant may not use Rule 14 to implead a third-party defendant who may have liability to the plaintiff *instead* of the defendant or in *addition* to the defendant. Rather, a defendant may use Rule 14 to implead a third-party defendant only if that third party will be liable to the *defendant* if the defendant is found liable to the plaintiff. Moreover, the liability of the third-party defendant to the defendant must be *contingent* on the defendant being held liable to the plaintiff:

> "Rule 14(a) allows a defendant to assert a claim against any person not a party to the main action only if that third person's liability on that claim is in some way dependent upon the outcome of the main claim. Rule 14(a) does not allow the defendant to assert a separate and independent claim even though the claim arises out of the same general set of facts as the main claim."

*Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir.2003) (quoting *United States v. Olavarrieta*, 812 F.2d 640, 643 (11th Cir.1987)). Thus, Bailey's claim against the County cannot be an independent claim (such as, say, misrepresentation or negligence), because such claims cannot be brought under Rule 14. Instead, his claim must be in the nature of a claim for indemnity or contribution, such as the type of claim that an insured might bring against his insurer after being sued for damages in connection with a car accident.

 The problem with Bailey's claim against the County is that Bailey has identified no cognizable legal theory under which he has a right of indemnity or contribution against the County. Bailey can, of course, *defend* against the United States's lawsuit by arguing that it was the County, and not he (or not just he), who violated the CWA. But to implead the County under Rule 14, Bailey must be able to claim—based on an insurance contract or statutory indemnification provision or something else—that, if he is held liable to the United States, then the County should be held liable to *him*. Bailey has identified nothing in the CWA or any law or contract that gives him such a right against the County, and thus his Rule 14 claim fails.[14]

At oral argument, Bailey seemed surprised when the Court's line of questioning revealed that he had not asserted a proper Rule 14 claim, and Bailey asked that the Court give him a chance to come up with a theory for why the County might have the type of obligation that could be enforced under Rule 14. The Court declines the invitation. Bailey impleaded the County over a year ago, and he has had ample time to determine whether he has a proper legal basis for his claim. Moreover, Bailey cannot reasonably argue that Judge Erickson's decision to permit him to implead the County was a kind of judicial imprimatur of his claim. Rule 14 is simply a procedur-

---

**14.** The County argues that Bailey's claims are precluded by the doctrines of claim and issue preclusion. It is unnecessary to address this argument, given the dismissal of the Rule 14 claim on other grounds. The Court notes, though, that if Bailey had asserted an *independent* claim against the County in this case—that is, if he had simply sued the County and argued "you are liable to me whether or not I am held liable to the government"—then Bailey's claim would most likely be precluded, as Bailey has already sued the County more than once on claims arising out of the same set of facts alleged in this case. *See Bailey v. U.S. Army Corps of Eng'rs*, No. 02–CV–639, 2002 WL 31728947, at *11–13 (D.Minn. Nov. 21, 2002) (dismissing Bailey's detrimental-reliance claim against the County). But, as described in the text, Bailey's Rule 14 claim is necessarily a *contingent* claim—a claim that "if and only if I am held liable to the United States, then you should be held liable to me." Bailey has yet to incur any liability, and thus any claim for contribution or indemnity against the County has yet to be adjudicated.

al device; it does not create a substantive right to relief. 6 Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1446 (2d ed.1990). If Bailey did not wish to be limited by the strictures of Rule 14, he could have objected to Judge Erickson's denial of his Rule 19 motion. But he did not. Bailey's third-party complaint against the County is therefore dismissed.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Bailey's motion for summary judgment [Docket No. 58] is DENIED.

2. Lake of the Woods County's motion for summary judgment [Docket No. 82] is GRANTED, and Bailey's third-party complaint against the County [Docket No. 26] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. The United States's motion to supplement the record [Docket No. 143] is GRANTED.

4. The United States's motion for summary judgment [Docket No. 76] is GRANTED IN PART AND DENIED IN PART as follows:

 a. Bailey's counterclaim [Docket No. 2] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

 b. The Court will enter an injunction requiring Bailey to restore the Site, at his own expense, to its pre-violation condition in accordance with the Restoration Order dated October 22, 2001 ("Restoration Order"), a copy of which is in the record at AR at COE0700–0705.

 c. Bailey shall file and serve a restoration plan no later than ninety days from the date of this order. The restoration plan shall contain

a schedule of the activities to be conducted to comply with the restoration order and a timeline for implementing each activity.

 d. The United States shall file and serve any comments on the restoration plan no later than forty-five days after Bailey has filed and served the plan. The Court will then review the submissions of the parties and issue a final injunction.

5. The United States's motion is DENIED in all other respects.